The AETNA CASUALTY AND SURETY COMPANY, Plaintiff,

v.

L. K. COMSTOCK & COMPANY, INC., a New York Corporation, Defendant.

No. Civil LV 74–72 RDF.

United States District Court, D. Nevada.

April 9, 1980.

Beckley, Singleton, DeLanoy & Jemison, Las Vegas, Nev., for plaintiff.

Cromer, Barker & Michaelson, Las Vegas, Nev., for defendant.

## POST VERDICT OPINION RE ENTRY OF APPROPRIATE JUDGMENT

ROGER D. FOLEY, Chief Judge.

This case is brought under diversity jurisdiction pursuant to 28 U.S.C. § 1332. All requirements for jurisdiction under this statute are satisfied.

The plaintiff, Aetna Casualty and Surety Company, as subrogee of Nevada Power Company, has sued L. K. Comstock & Company, Inc., on Comstock's subcontract with Stearns-Roger, Inc., concerning the electrical work on a 70,000 barrel oil storage tank Stearns-Roger was building for Nevada Power. Nevada Power was a third party beneficiary of that subcontract. After a terrible explosion in which two Comstock employees died, plaintiff paid $338,518.61 to settle the wrongful death suits that resulted. Following an out-of-court settlement, plaintiff brought this action against Comstock for that amount based upon two separate claims. The first claim is that Comstock was bound to indemnify plaintiff under the terms of the subcontract, and the second claim is that Comstock also breached its obligation in the subcontract to obtain insurance with Nevada Power Company as a named insured.

Comstock's position was that the "Subcontract General Conditions" which contained those provisions were not part of the subcontract. Alternatively, Comstock argued that either equitable estoppel or waiver prevented those provisions from being enforced against it. Upon Comstock's demand, trial was before a jury.

At the end of the trial and before questions were submitted to the jury, this Court ordered several directed verdicts sua sponte. In particular, a verdict was directed against the defendant without a motion that, because there was no evidence of reliance, there could not be any equitable estoppel.

■ The source of a federal district court's judicial authority to order a verdict on its own motion is threefold. First is the language in Rule 41(b), FRCP, contemplating, in addition to the dismissal on motion of the defendant for failure to prove a claim, a "dismissal not provided for in this rule." Second, Rule 50(a), FRCP, while referring to a motion for directed verdict, only concerns itself with a motion made by a party and the effect of a denial of such a motion. Third is the Court's inherent and independent discretionary powers. Those courts that have addressed this question have agreed that a district court does have the power to grant directed verdicts sua sponte. *Safeway Stores v. Fannan*, 308 F.2d 94, 98–99 (9th Cir. 1962); *Peterson v. Peterson*, 400 F.2d 336, 343 (8th Cir. 1968).

Acting upon its authority under Rule 49(a), FRCP, this Court submitted five questions to the jury. These questions were, in essence:

1. whether the out-of-court settlement was reasonable and made in good faith;

2. whether the "Subcontract General Conditions" were part of the subcontract;

3. whether Comstock had been negligent and, if so, whether that negligence was a proximate cause of the accident;

4. whether Nevada Power had been negligent and, if so, whether that negligence was a proximate cause of the accident; and

5. whether Comstock's obligation to obtain insurance with Nevada Power as a named insured had been waived, when Stearns-Roger accepted a certificate of insurance which did not name Nevada Power an additional insured, and when Stearns-Roger permitted Comstock to begin work without a certificate of such insurance.

The jury answered "Yes" to each question.

Because of the affirmative response to questions Nos. 3, 4 and 5, the parties were requested to prepare briefs indicating what judgment should be entered in light of the jury's findings and the directed verdicts ordered sua sponte. While those briefs were being prepared, this Court discovered that question No. 5 had been erroneously submitted to the jury.

The instruction which accompanied question No. 5 read as follows:

## "WAIVER

"Parties to a contract may relieve the other party of performance of a contract or parts thereof by waiving their rights under the contract. A waiver may be express or implied from acts or conduct.

"Waiver is the intentional relinquishment of a known right. Waiver is an affirmative defense. The burden of proof is upon the defendant to prove waiver by a preponderance of the evidence. In order to establish the defense of waiver, the defendant must prove the defense with clear evidence. In order for the defendant to be entitled to rely upon the defense of waiver, the defendant must establish that in *reasonable reliance upon the defense of waiver, the defendant must have been misled to its prejudice.*" (Emphasis added)

The italicized language was an incorrect statement of Nevada law. Although it tracked the holding of the Nevada Supreme Court in *Melahn v. Melahn*, 78 Nev. 162, 370 P.2d 213 (1962), the language of that holding was itself misleading and incorrect. Apparently both parties were misled by that holding since both sides relied on it in their proposed instructions. The result was that the error slipped by the Court and question No. 5 was submitted to the jury when it should not have been. Why this instruction was erroneous will now be explained.

In general, it must be remembered that there are three separate legal doctrines involved in any determination of whether or not there has been a waiver. These three doctrines are: (1) a waiver, also called an "express waiver"; (2) an "implied waiver"; and (3) an equitable estoppel. The first and easiest distinction is that between a waiver and an estoppel.

■ A waiver is a voluntary and intentional abandonment or relinquishment of a known right, whereas an equitable estoppel may arise even though there was no intention on the part of the party estopped to relinquish or change any existing right. Prejudice to the other party is one of the essential elements of an equitable estoppel, whereas there can be a waiver although the party asserting it has not been misled to his prejudice or changed his position. A major distinction is that waiver involves the act and conduct of only one of the parties, that is, it depends upon what one himself intended to do regardless of the attitude assumed by, or actions of, the other party.

In contrast, equitable estoppel involves the conduct of both parties, since it is based upon some misleading conduct or language of one person and reliance thereon by another who is misled thereby to his prejudice.

■ Although the distinction between an express waiver and an estoppel is fairly clear, the line between an estoppel and an implied waiver is confusing. In fact, these doctrines merge into each other so that it is difficult to determine the exact point where one ends and the other begins. Especially in the law of insurance, the two terms have come to be used interchangeably. Thus, when the term "waiver" is used with regard to insurance, it is employed to designate not an express waiver, but one which has become effective through the application of the principles underlying estoppels, i. e., an "implied waiver." See Am.Jur.2d, *Estoppel and Waiver*, § 30; 16A Appleman, *Insurance Law & Practice*, § 9081 (1972).

Because this diversity action is governed by the substantive law of Nevada, this Court must look to the decisions of the Nevada Supreme Court to determine the applicable law concerning express waiver and implied waiver. Unfortunately, the Nevada court's decisions dealing with waiver of contract terms are terribly inarticulate. Thus, considerable effort is required to decipher the pertinent cases.

■ For example, in *Melahn v. Melahn*, supra, the case cited by both parties as authority for instruction No. 5, an implied waiver and not an express waiver was at issue. Yet, the Court said:

"In order to establish a waiver, the intention to waive must clearly appear, *Afriat v. Afriat*, 61 Nev. 321, 117 P.2d 83, 119 P.2d 883, and the party relying upon the waiver must have been misled to his prejudice. *Union Central Life Ins. Co. v. Schultz*, 45 Idaho 185, 261 P. 235; *Universal Gas Co. v. Central Illinois Public Service Co.*, 7 Cir., 102 F.2d 164."

78 Nev. at 166, 370 P.2d at 215–16.[1]

Furthermore, the two cases cited as support for the statement that the party relying upon "a waiver" must have been misled to his prejudice, dealt with implied waivers. Thus, it is clear that the *Melahn* Court did not intend to give the impression that an express waiver requires prejudice. What the Court obviously meant was that an *implied* waiver requires that the party relying upon it must have been misled to his prejudice.

The Nevada court clearly recognized the distinction between express waiver and implied waiver in *Violin v. Fireman's Fund Ins. Co.*, 81 Nev. 456, 406 P.2d 287 (1965), a case subsequent to *Melahn*. In that case, the Court said:

"In the law of insurance waiver is defined as the giving up of a known privilege or power. It may be express or implied from circumstances and always involves consent, express or implied, but does not necessarily rise to the level of contract."

81 Nev. at 462, 406 P.2d at 290 (citation omitted).

Nevada had first recognized the difference between an express waiver and an

implied waiver in *Killip v. Empire Mill Co.*, 2 Nev. 34 (1866). In that case, the Nevada court said that there are two ways a person may waive a right: by express waiver or by implied waiver. The exact language used by the Court was as follows:

"Usually a person waives a right in one of two ways: as by express declaration of intention to waive a right, or some act equally indicative of such intention; or, on the other hand, by some act or declaration which has induced another party to think he has waived his right, and induce the other party to act on that supposed waiver. In this latter case, the waiver is a species of estoppel?"

2 Nev. at 40.

The defendant argues that by the use of the language "or some act equally indicative of such intention," the Nevada court merged express waiver and implied waiver under the heading of "express waiver." The defendant claims that the result of that merger is that there need not be any showing of prejudice or change of position to establish either type of waiver. The effect of this argument is to bootstrap what otherwise would be an implied waiver requiring prejudice into an express waiver not requiring prejudice. Such an interpretation of *Killip* fails for several reasons. First, such an interpretation completely ignores the clear distinction between express waiver and implied waiver noted in *Violin*, and it avoids the requirement of prejudice for an implied waiver as required by *Melahn*. Second, that language obviously refers to a

---

1. In that case, a husband appealed a decision in favor of his divorced wife for arrearages in child support payments. Their divorce decree had required the husband to pay medical bills for their children only if the bills were supported by affidavits on verification from the treating doctors and dentists. It further provided that the husband could be deprived of visitation rights if he failed to make his payments, but it relieved him from making support payments if the wife refused to allow his visitation rights.

For eight years the wife submitted unverified medical bills and the husband paid them. Finally, the husband wrote his ex-wife a letter in which he stated that he was amazed at the

number and amount of bills he was paying and that all future bills had to comply with their divorce decree. However, the wife continued to send him unverified bills, so he refused to pay them. As a result, the wife denied him his visitation rights. In response, the husband refused to make any child support payments. Consequently, she sued for and won the support arrearages.

In the appeal, the wife contended that the husband's payment of unverified medical bills for eight years constituted an implied waiver of the provision for verified bills. The Nevada Supreme Court rejected her argument and reversed. Unfortunately, in doing so, the Court used the imprecise language quoted above.

situation in which a person does some physical act to the contract in order to waive a right, instead of expressly declaring his intent to waive that right. An example would be if one party to a contract, in front of the other party, crosses out a contract term giving him a right and then hands the contract back to the other party without saying anything. The result in that situation would be an express waiver performed without an express declaration of intent to waive, and neither prejudice nor change of position would have to be shown.

Furthermore, the Nevada cases cited by defendant in its closing brief to sustain its interpretation of *Killip* do not support the broad proposition defendant claims they do. *Doyle v. Jorgensen*, 82 Nev. 196, 414 P.2d 707 (1966); *Overton v. State*, 78 Nev. 198, 370 P.2d 677 (1962); and *Hill v. Thomas*, 70 Nev. 389, 270 P.2d 179 (1954), are of no help in resolving the issue before this Court for at least two reasons: first, the references to "waiver" in each case are so miniscule; and, second, none of those cases dealt with any waiver of contract terms or conditions.[2] The other three cases cited by defendant are closer to the issue in this case, but they are clearly distinguishable.

In *Summa Corp. v. Richardson*, 93 Nev. 228, 564 P.2d 181 (1977); *Reno Realty & Investment Co. v. Hornstein*, 72 Nev. 219, 301 P.2d 1051 (1956); and *Sharp v. Twin Lakes Corp.*, 71 Nev. 162, 283 P.2d 611 (1955), the Nevada court recognized and applied the general rule that a landlord's acceptance of rent after breach of a covenant in a lease, with full knowledge of the facts, constitutes a "waiver" of his right to forfeiture arising from such breach. As defendant points out, in none of those cases did the Court determine if any of the lessees had been prejudiced or had changed their positions. However, the Court also failed to articulate what type of waiver was involved.

A close examination of all three cases reveals that each case dealt with a unique type of implied waiver, that is, implied waiver imposed by property law concepts. The Nevada court's decision in *Reno Realty* clearly shows that this type of waiver arises only in the landlord-tenant situation. In *Reno Realty*, the Court noted that the waiver of the right to terminate a lease resulting from acceptance of rent is based upon the concept that a lease is both a contract and a conveyance of a property interest. Thus, "having received rent after notice of [a breach, the lessor] is precluded from taking advantage of the forfeiture because it is a contradiction in terms to treat a man as a tenant and then treat him as a trespasser." 72 Nev. at 225, 301 P.2d at 1054 (quoting *Finch v. Underwood*, 2 Ch.Div. 310, 316).

Because this unique type of implied waiver is imposed by law, prejudice or change of position need not be shown. Thus, the Nevada court's silence on those elements of implied waiver is not significant when applied to regular contracts not involving the landlord-tenant relationship. Defendant's argument that these cases are analogous to the case at bar is not persuasive.

To summarize Nevada law concerning waiver of contract rights, the following principles can be drawn from all of the cases cited above. First, despite the possibly misleading language in *Killip*, Nevada recognizes the distinction between an express waiver and an implied waiver. Because an express waiver is the voluntary relinquishment of a known right, it does not require any prejudice or change of position by the other party. Furthermore, notwithstanding the inarticulate language used in *Melahn*, there is no requirement of prejudice for an express waiver. In contrast, an

---

2. The references to "waiver" in these cases are as follows:

   (a) *Doyle v. Jorgensen*: once a defendant makes a general appearance, he waives any defects in the service of process upon him;

   (b) *Overton v. State*: by proceeding to trial upon the merits, without raising any objection to the proceedings before the magistrate, a criminal defendant waived any irregularities which might have occurred therein;

   (c) *Hill v. Thomas*: by virtue of the Bond Trust Fund Act of 1937, the State of Nevada consented to suit against it on official bonds, waiving its sovereign immunity therefrom.

   If anything, these cases show that Nevada recognizes a type of waiver imposed by law.

implied waiver is a "species of estoppel" which does require prejudice or change of position, unless it is imposed by law as a result of a landlord-tenant relationship. .

Since the instruction which accompanied question No. 5 failed to make this distinction between express waiver and implied waiver, it was incorrect as given. Such a distinction had to have been made because only an implied waiver was at issue in this case, there being no evidence of any express waiver.

The significance of this error arises in light of the Nevada court's statement in *Killip* that an implied waiver is "a species of estoppel." This Court directed a verdict sua sponte that there was no evidence of reliance to support an estoppel. This Court should also have directed a verdict sua sponte that there was no evidence of prejudice to support an implied waiver. Indeed, this Court would have directed such a verdict had the distinction between the two types of waiver, as well as the requirement of prejudice for an implied waiver, been brought to the Court's attention. Thus, question No. 5 should not have been submitted to the jury. The result of all this is that there is no evidence upon which the jury could properly have found that Stearns-Roger "waived" any right it may have had to require Comstock to perform paragraph 9.1 of the subcontract. This is so even though the evidence is viewed in the light most favorable to defendant.

■ Since question No. 5 should not have been submitted to the jury in the first place, and since there is no evidence upon which the jury could properly have found "a waiver," the question now is whether this Court can do anything to correct the situation without ordering a new trial. This question is approached with the initial recognition that the Seventh Amendment's right to jury trial was designed "to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 337, 99 S.Ct. 645, 654, 58 L.Ed.2d 552, 565–66 (1979), quoting *Galloway v. United States*, 319 U.S. 372, 392, 63 S.Ct. 1077, 1088, 87 L.Ed. 1458, reh. denied, 320 U.S. 214, 63 S.Ct. 1443, 87 L.Ed. 1851 (1943).

In contrast to the situation concerning directed verdicts, the rule is well settled that Rule 50(b) forbids the trial judge or an appellate court from entering a judgment notwithstanding the verdict in the absence of a timely motion for such a judgment. See, e. g., *Johnson v. New York, New Haven & Hartford R. Co.*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952); *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1946); *Philhall Corp. v. United States*, 546 F.2d 210 (6th Cir. 1976). The reasons for this rule appear to be that Rule 50(b) provides clear and explicit steps which must be followed before a J.N.O.V. can be entered and that the party who had a judgment could lose his jury right if he is not able to respond to a motion from his adversary.

However, Rule 49(a) itself provides a remedy by which this Court may simply ignore the jury's finding on question No. 5. Rule 49(a) provides in pertinent part:

" . . . the court may submit . . written forms of the several special findings which might properly be made under the pleadings and evidence;"

■ As previously discussed, the real "waiver" issue in this case was whether or not there had been an implied waiver, not an express waiver. And, there was no evidence of prejudice upon which the jury could properly have found an implied waiver. Thus, finding No. 5 could not "properly be made under the pleadings and evidence." Therefore, the submission of question No. 5 to the jury was error. Under *Gough v. Rossmoor Corp.*, 487 F.2d 373 (9th Cir. 1973), cert. denied, 429 U.S. 857, 97 S.Ct. 155, 50 L.Ed.2d 134, the jury's answer to that question should be and will be ignored.[3]

---

**3.** In the *Gough* case, the plaintiff sued for treble damages under section 4 of the Clayton Act (15 U.S.C. § 15) for violation of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

## INDEMNITY

■ Under Rule 58(2), a trial court retains the power and control over the entry of a judgment to the extent of determining what is the appropriate judgment to be rendered ·in accordance with a jury's answers to interrogatories. *Continental Casualty Co. v. Little,* 152 F.2d 728 (5th Cir. 1946); *Wilson v. Eberle,* 15 Alaska 651, 18 F.R.D. 7 (1955). Thus, the question now is, what appropriate judgment is to be entered in light of the jury's answers to the four questions ˙that were properly submitted. Determination of what is the appropriate remedy turns upon the issue of whether or not Comstock was contractually bound to indemnify Nevada Power even though Nevada Power was concurrently negligent.[4]

Any right of Nevada Power to indemnity from Comstock may be asserted by Aetna as subrogee to Nevada Power.

There are two separate indemnity clauses in the subcontract between Comstock and Stearns-Roger. Section 9.3 of that subcontract reads as follows:

"Indemnification. Subcontractor agrees to indemnify Owner and Prime Contractor against and hold Owner and Prime Contractor harmless *from any and all claims, liabilities, obligations and causes of action of whatsoever kind or nature* for injury to or death of any person (including Owner's and Prime Contractor's employees), and for damage to or destruction of property (including Owner's and Prime Contractor's property), *resulting*

---

Pursuant to Rule 49(a), the following special *interrogatories were submitted to the jury and* these answers were given:

"1. Did the defendants and Leisure World Foundation or Golden Rain Foundation by means of a common plan, scheme or design have the power and intention to exclude plaintiff from the carpet and/or other business in Rossmoor Leisure World?
"Yes.
"2. Did defendants enter into a common plan, scheme or design with Leisure World Foundation or Golden Rain Foundation to prevent plaintiff from advertising carpets in the Leisure World News such as to act as a restraint on plaintiff's business of selling carpets or other merchandise at Rossmoor Leisure World?
"Yes.
"3. If your answer to either of the preceding questions is in the affirmative, did such restraint have a substantial effect on interstate commerce or the flow of interstate commerce?
"No.
"4. Has plaintiff suffered any monetary damage by reason of its inability to advertise in Leisure World News?
"Yes.
"5. If so, please indicate the amount opposite the appropriate type of damage you find to have been suffered.

| | |
|---|---|
| Net Profits | $18,143.00 |
| Good Will | 22,738.00" |

487 F.2d at 375 n. 2.
Because of the jury's response of "No" to interrogatory No. 3, judgment was entered for defendants on the ground that this answer deprived the Court of jurisdiction under the Sherman Act. On the appeal, the Ninth Circuit said that the jurisdiction question should have been decided by the Court instead of going to the jury. The Court said, in pertinent part:

"It is doubtful whether the jurisdictional issue should have been submitted to the jury, even had the evidence been in dispute. . .

" . . .

"In any event, there was no conflict in the evidence as to the facts relevant to jurisdiction. The undisputed facts established that the necessary relationship to interstate commerce did exist. In these circumstances, it was error to submit the jurisdictional issue to the jury under Rule 49(a) . . .. The jury's erroneous answer to the jurisdictional interrogatory should have been ignored."
487 F.2d at 377 (citations omitted).

The judgment for the defendants was vacated, and the cause was remanded for further proceedings consistent with the circuit court's opinion. Although there have been further litigation and appeals, this particular holding has not been challenged.

---

4. As a preliminary matter, it should be noted that there is an important distinction between contribution, which distributes the loss among the tort-feasors by requiring each to pay his proportionate share, and indemnity, which shifts the entire loss from one tort-feasor who has been compelled to pay it to another who should bear it instead. One of the simplest bases for indemnity is a contract which provides for it. However, the right to indemnity may arise without agreement and by operation of law to prevent a result which is regarded as unjust or unsatisfactory. Prosser, Law of Torts, 3rd Ed., § 48, pp. 278-79. What is at issue in this case is contractual indemnity.

740

from any and all acts or omissions of Subcontractor, or of any Sub-Subcontractor's employees in connection with the performance of the work covered by this subcontract." (Emphasis added.)

Section 11.5 of that subcontract reads as follows:

"The Subcontractor agrees to indemnify and hold harmless Owner and Prime Contractor from and against *any and all claims, liabilities, obligations, and causes of action of whatsoever kind or nature as a result of the failure to comply with the above safety requirements.*" (Emphasis added.)

The safety requirements referred to in Section 11.5 were defined in Section 11.3 as all "Federal, Provincial, State, local and Prime Contractor's orders, rules and regulations governing safety and the safe performance of the work." In addition to the indemnity provisions, Section 9.1 required Comstock to obtain insurance with Nevada Power as a named insured.[5]

The jury found that both Comstock and Nevada Power were negligent and that each party's negligence was a proximate cause of the accident. Thus, the question is whether these indemnity provisions require Comstock to indemnify Nevada Power for Nevada Power's own, yet concurrent, negligence.

This is a diversity action in which Nevada law applies. However, there is no Nevada law, either statutory or case law, dealing with the contractual obligation of an indemnitor to indemnify its indemnitee for the indemnitee's concurrent negligence. There is a very clear split of authority among other jurisdictions concerning this issue. The traditional majority position is that strict construction should be applied to such indemnity contracts so that express or explicit reference to the indemnitee's own negligence is required. However, the more modern minority position is that strict construction should not be applied. See, e. g., Annot., 27 A.L.R.3d 663 (1969); Annot., 68 A.L.R.3d 7 (1976).

The defendant points to the conflicting case law to argue that the subcontract is ambiguous and so should be construed against the party that drafted it and in favor of Comstock. This approach reverses the cardinal rule of contract construction that a court should focus upon the contract provisions and try to determine the intent of the parties. If their intent can be ascertained, the court gives effect to that intent if it can be done consistently with legal principles. Where the language chosen by the parties, given its ordinary and natural meaning, unambiguously manifests that intent, the judicial task is done. *Jacksonville Terminal Co. v. Railway Express Agency, Inc.*, 296 F.2d 256, 259 (5th Cir. 1961), cert. denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18.

---

5. Section 9.1 of the subcontract between Comstock and Nevada Power reads as follows:

"Insurance. Subcontractor agrees to obtain and to keep in force during the term of this subcontract the below described insurance coverage relating to the work, with Owner and Prime Contractor as named insureds. Such insurance shall be carried with insurance companies satisfactory to Prime Contractor, and Subcontractor will furnish Prime Contractor with certificates evidencing such insurance coverage prior to commencing any work under this subcontract. Three copies of each certificate evidencing such coverage are to be mailed to party indicated in purchase order. The certificates must show the Prime Contractor's subcontract number so that Prime Contractor can identify the same by project. The insurance coverage which Subcontractor shall so obtain and keep in force is as follows:

"a. Workmen's Compensation and/or Employer's Liability Insurance as required under the laws applicable to the work, which shall cover all of Subcontractor's employees engaged in the work.

"b. Automobile Public Liability Insurance covering all automotive equipment used in connection with the work, with not less than $500,000/$1,000,000 bodily injury and $500,000 property damage coverage.

"c. Comprehensive Public Liability Insurance (including contractual liability insurance covering the indemnification appearing in paragraph 9.3) covering work performed under this subcontract, with not less than $500,000/$1,000,000 bodily injury coverage and property damage insurance with limits of $500,000 as to any one occurrence."

The Ninth Circuit followed such an approach in *Unitec Corporation v. Beatty Safway Scaffold Co. of Oregon*, 358 F.2d 470, 478–79 (9th Cir. 1966). That case was a diversity action. The indemnity provision in that case was between Unitec, the indemnitor, and Goodyear, the indemnitee. Section A of their contract stated in pertinent part that Unitec was to indemnify Goodyear "at all times against any liability . . . on account of any and all claims." Section B of the contract provided that Unitec was to maintain insurance to protect both parties.

The district court, sitting without a jury, had found that both Unitec and Goodyear had been negligent and that their negligence was the proximate cause of the resulting damage. In finding both parties negligent, the district court rejected Goodyear's claim to indemnification under the contract. The Ninth Circuit reversed, holding that the contract was sufficiently explicit in its indemnification requirement to hold Unitec responsible for Goodyear's acts of negligence. In the Court of Appeals' view, a reasonable reading of the two sections led to the conclusion that the indemnification covered claims arising "in whole or in part" from any negligence of Unitec. 358 F.2d at 479. The Court said that Section B's obligation to obtain insurance for both parties could only have meaning if it was construed as a measure to protect Goodyear against loss caused by its own negligence. Thus, inclusion of that section showed that the parties intended the indemnification to include the indemnitee's concurrent negligence.[6] Significantly, that result was reached by the Ninth Circuit without having to decide which rule of indemnity contract interpretation the applicable state law would have followed because the intent of the parties was clear from the contract language and no rule of construction needed to be examined.

■ Section 9.1 of the Comstock-Stearns-Roger subcontract corresponds to Section B of the *Unitec* indemnity contract. Thus, Comstock's indemnity provisions, when combined with the provision to obtain insurance with Nevada Power as a named insured, can likewise have meaning only if the entire contract is construed as a measure to protect Nevada Power against loss caused by its own negligence. As in *Unitec*, the only possible result from a reasonable reading of those provisions is that Comstock was bound to indemnify Nevada Power so long as the injury was caused in whole or in part by Comstock. This Court is firmly convinced that it was the parties' intent that Comstock would indemnify Nevada Power even if Nevada Power was concurrently negligent.

■ The jury's findings that the settlement was reasonable as well as in good faith, that the "Subcontract General Conditions" were part of the contract, that Comstock was negligent and such negligence was a proximate cause of the accident, make Comstock liable to indemnify Nevada Power in full. Any negligence of Nevada Power was immaterial so long as Comstock's negligence was a proximate cause of the accident.

Assuming the intent of the parties was not so clear, the question would then be, which rule of construction should this Court apply to interpret the indemnity provisions? The majority rule of strict construction was based upon the notion that an indemnity contract imposed such an extraordinary liability on the indemnitor that close judicial scrutiny was called for. Under this rule, there would be no indemnity because the language of Sections 9.3 and 11.5 does not expressly state that Comstock must indemnify Nevada Power for its own negligence.[7]

6. Interestingly, *Booth-Kelly Lumber Co. v. Southern Pacific Co.*, 183 F.2d 902, 20 A.L.R.2d 695 (9th Cir. 1950), which was cited by the *Unitec* Court, said, in pertinent part:

"[S]ince the parties have themselves dealt with the question of indemnity in their written contract, we think it is fair to say that

they intended it, rather than some general common law rule, to govern their rights and liabilities in this situation."
183 F.2d at 907.

7. For example, in California, a state that has played a significant role in developing the majority rule, Sections 9.3 and 11.5 would be clas-

The modern minority rule is that an indemnity provision "for any and all liability" means *all* liability, including that arising from the indemnitee's concurrent negligence. This rule rejects the majority's rationale that one person indemnifying another person for the other's own negligence is such an unusual or hazardous situation that close judicial interpretation is called for. Instead, the minority view is that such indemnity contracts are so common in the modern business world that courts should leave the parties with their bargain for "any and all liability." *Martin v. Maintenance Co., Inc.*, 588 F.2d 355 (2nd Cir. 1978); *Jacksonville Terminal Co. v. Railway Express Agency, Inc.*, 296 F.2d 256, 262 (5th Cir. 1961), cert. denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18.

The evolution of this more enlightened modern rule can be seen by comparing the Ninth Circuit's holding in *United States v. Wallace*, 18 F.2d 20 (9th Cir. 1927), with the *Unitec* decision. In *Wallace* the Court said:

"The established principle is thought to be that general words alone do not necessarily import an intent to hold an indemnitor liable to an indemnitee for damages resulting from the sole negligence of the latter; it is but reasonable to require that an obligation so extraordinary and harsh should be expressed in clear and unequivocal terms."

18 F.2d at 21 (citations omitted).

Some forty years later, the Ninth Circuit said, in the *Unitec* decision:

"It is by now well established that indemnification will be ordered in cases where the indemnitee as well as the indemnitor has been negligent, even in the absence of an explicit contractual agreement to that effect, when to hold otherwise would render the contract of indemnity meaningless. . . . This is such a case, for unless Unitec is required to indemnify Goodyear notwithstanding Goodyear's negligence, the contract of indemnity would afford Goodyear no protection which it did not already possess. This is particularly so where, as in this case, the parties have negotiated a contract price which reflects that one party (Unitec) is to bear the cost of premiums for liability insurance for any acts of negligence of either one or both of the parties to the contract."

358 F.2d at 479 (citations omitted).

In the absence of any controlling Nevada precedent, this Court may assume that Nevada would follow the modern minority rule because it is the more enlightened view. Therefore, this Court adopts the minority rule. Under that rule, the fact that Nevada Power was concurrently negligent is immaterial, and Comstock is bound by its contract to indemnify Nevada Power in full. Thus, there are two separate reasons why Comstock is liable in full to in-

---

sified and then a specific rule for that classification would be applied. *MacDonald & Kruse, Inc. v. San Jose Steel Co., Inc.*, 29 Cal.App.3d 413, 105 Cal.Rptr. 725 (1972), approved in *E. L. White, Inc. v. City of Huntington Beach*, 21 Cal.3d 497, 146 Cal.Rptr. 614, 579 P.2d 505 (1978); *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal.3d 622, 119 Cal.Rptr. 449, 532 P.2d 97 (1975). This scheme is as follows:

*Type One*: The indemnity provision provides expressly and unequivocally that indemnitor is to indemnify indemnitee for indemnitee's negligence. The result is that an indemnitee is indemnified whether his liability arises from his negligence alone or his concurrent negligence with the indemnitor.

*Type Two*: The indemnity provision contains language to the effect that indemnitor is to indemnify indemnitee "from any and all claims" arising out of performance of their contract. Under this type, the indemnitee is in-

demnified from his own negligence only if his negligence was passive and not active.

*Type Three*: Provides that the indemnitor is to indemnify the indemnitee for the indemnitee's liability caused by the indemnitor, but which does not provide that the indemnitor is to indemnify the indemnitee for the indemnitee's liabilities that were caused by other than the indemnitor. Under this type of provision, any negligence on the part of the indemnitee, either active or passive, bars indemnification.

Although both indemnity provisions contain the "any and all" language indicative of Type Two, they are really Type Three provisions. This is because both of them are limited to causes of action caused by the indemnitor without mentioning liability caused other than by the indemnitor. Since Nevada Power was negligent, indemnification would be barred under the majority rule.

demnify Nevada Power: first, the contract clearly expresses such an intent, and, second, this result is reached under application of the minority rule of construction, which would be the applicable rule of state law. As Nevada Power's subrogee, Aetna may assert that right to indemnity against Comstock.

## CONTRIBUTION

■ Assuming that for some reason this Court is wrong in its judgment that Comstock must indemnify Aetna as Nevada Power's subrogee, Aetna would still be entitled to recover from Comstock one-half of what it cost Aetna to settle the wrongful death claims.

In response to question No. 2, the jury found that the "Subcontract General Conditions" were part of the subcontract between Comstock and Stearns-Roger. Section 9.1 of those General Conditions provided that Comstock was to obtain insurance with Nevada Power as a named insured. Instead of obtaining such insurance, Comstock merely obtained coverage under the Nevada Industrial Insurance Act and presented Stearns-Roger with a certificate of that insurance.[8] The fact that Comstock failed to obtain the insurance required under Section 9.1 was not disputed. In fact, Comstock admitted it never named Nevada Power as an additional named insured.[9]

Although this Court might have submitted a specific question to the jury as to whether or not Comstock breached its contractual obligation under Section 9.1, it was not necessary to do so. A jury's function under Rule 49(a) is solely one of fact finding. The jury is not bound to apply the legal consequences of its findings since that can be done by the Court. *Miller v. Royal Netherlands Steamship Co.*, 508 F.2d 1103, 1107–08 (5th Cir. 1975). Once the jury found that the General Conditions were part of the subcontract, Comstock was bound to satisfy Section 9.1. There was no evidence that could have supported any finding that Section 9.1 had been performed. Before the questions were submitted to the jury, the Court directed a verdict that if the purchase order (Exhibit 1) and the subcontract terms and conditions (Exhibit 2) were part of the same contract, defendant was duty-bound to comply with paragraph 9.1 of the subcontract terms and conditions. Thus, the legal consequence of the jury's finding on question No. 2, and the Court's directed verdict, was that Comstock breached its contract to obtain insurance with Nevada Power as a named insured. Under the previously discussed court powers, under Rules 49(a), 50(a) and 58(2), this Court now holds that Comstock breached that contract.

As a result of that breach of contract, Aetna, as Nevada Power's insurer, paid $338,518.61 by itself to settle the wrongful death claims. Whereas, if Comstock had performed its contract to supply insurance, Aetna would have had a right of contribution for one-half that amount from Comstock's insurer. 6 Appleman, *Insurance Law and Practice*, § 3902 (1972). Thus, Comstock's breach of Section 9.1 damaged Aetna in the amount of $169,259.30.

Therefore, if this Court's ruling that Comstock must indemnify Aetna in full were to be reversed on appeal, then the judgment of this Court would be that Comstock is liable to Aetna for $169,259.30 for breach of contract.

In light of all of the above, and in accordance with the jury's answers to questions 1–4, it is the opinion of this Court that the appropriate judgment must be in favor of Aetna, as subrogee of Nevada Power, for full indemnity against Comstock. Therefore, it is hereby ordered that Comstock is to indemnify Aetna in the amount of $338,518.61, plus interest at 7% from the 29th day of Sept., 1975.

---

**8.** See plaintiff's Exhibit No. 8.

**9.** Trial brief of defendant at p. 2.